```
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF KENTUCKY
                NORTHERN DIVISION
                  AT COVINGTON
```

CIVIL ACTION NO. 2007-164 (WOB)

CELESTE PALMER                                          PLAINTIFF

VS.                 <u>MEMORANDUM OPINION AND ORDER</u>

CITY OF COVINGTON, ET AL                               DEFENDANTS


This matter is before the court on the motions of defendants for summary judgment (Docs. #67, #69).

The court heard oral argument on these motions on Monday, November 2, 2009. Marcus S. Carey represented the plaintiff, Celeste Palmer, who was personally present; Stephen McMurtry, Frank Warnock, and Alex Mattingly represented defendant The City of Covington; and Philip Taliaferro and Alice Keys represented defendants Mark Richardson and Corey Warner. Official court reporter Joan Averdick recorded the proceedings.

Having heard the parties, the court now issues the following Memorandum Opinion and Order. As discussed below, except as to the municipal defendant, the record is replete with genuine disputes of material fact which make summary judgment inappropriate.

### *Factual and Procedural Background*

On January 12, 2007, plaintiff Celeste Palmer, a 46-year old black female, and her boyfriend, Brian McKenzie, were together at

a bar in Covington, Kentucky.  Palmer became upset with McKenzie at the bar because she believed he was flirting with another woman.  (Palmer Depo. 142)  As a result, Palmer left the bar alone, walked home, and went to bed.  Palmer testified that she had two beers while at the bar.  (Palmer Depo. 136)

Several hours later, Palmer received a phone call from McKenzie, who said he was on the way to the house and intended to stay the night.  (Palmer Depo. 81)  Palmer thought McKenzie sounded "impaired" and that if he came there, they would have an argument.  Palmer did not want McKenzie to spend the night, although he often stayed there, and she therefore placed a 911 call to the Covington Police for assistance.  (Palmer Depo. 145)

Covington Police Officers Mark Richardson and Corey Warner arrived at Palmer's house around 1:45 a.m.  At that time, Palmer was yelling and cursing at McKenzie, who also had just arrived at the house.  (Palmer Depo. 83)  The officers told Palmer to settle down and stop yelling at McKenzie.  (Palmer Depo. 84)  Officer Warner took Palmer into the kitchen to talk to her.  (Richardson Depo. 70; Warner Depo. 29)

Officer Richardson accompanied McKenzie upstairs to get some of his belongings, which he put into a small duffel bag.  (McKenzie Depo. 168-171; Richardson Depo. 71)

Covington Police Officer Jonathan Mangus also responded to the call because Palmer's house was located on his "beat."  When

he arrived, Mangus observed Officer Richardson talking in the foyer with McKenzie. Mangus testified that Officer Warner was in the kitchen with Palmer, who was "pretty agitated" and "ranting and raving" about the police not getting McKenzie out of the house. (Mangus Depo. 30-33) Mangus left the house after only about five minutes because he received another call. (Richardson Depo. 43-44)

Palmer testified that once she realized that McKenzie was not as impaired as she thought he was and that he was leaving voluntarily, she told the officers everything was okay and asked the officers to leave her house. (Palmer Depo. 85, 211; McKenzie Depo. 174-75) Palmer testified that the officers said to her, "That's not the way it works." (Palmer Depo. 151) After asking them to leave "about fifteen times," she yelled at them "to get the hell out of her house." (Palmer Depo. 84) One of the officers yelled at Palmer to "shut up" or "calm down." (Palmer Depo. 161)

McKenzie called his father to come pick him up, and the police officers asked him to wait outside the house until his ride arrived. (McKenzie Depo. 174) McKenzie then walked outside onto the porch, accompanied by Officers Richardson and Warner. (Richardson Depo. 72) McKenzie testified that by the time he walked outside, Palmer "was pretty well calm." (McKenzie Depo. 186) Officers Richardson and Warner testified, to the contrary,

3

that Palmer was continuing to yell and scream at them when they were outside. (Richardson Depo. 74; Warner Depo. 39)

Officer Warner went back inside the house and told Palmer she was under arrest. (Richardson Depo. 74; Warner Depo. 41) Officer Richardson followed behind him. Palmer asked what she was being arrested for, and one of the officers said "disorderly conduct." (Palmer Depo. 153-55; Richardson Depo. 67) Palmer testified that she did not resist being arrested. (Palmer Depo. 165) The officers allege that they instructed Palmer to drop her cell phone and that she refused to comply. (Richardson Depo. 76) Officer Warner pushed Palmer up against the wall, grabbed her left arm and pushed it behind her back, and then lowered it and placed a handcuff on her left wrist. (Palmer Depo. 283, 286; Richardson Depo. 74-76)

Officer Richardson then grabbed Palmer's right arm, yanked it and roughly "jabbed" it up behind her back. (Palmer Depo. 163, 167, 287) Palmer said "You're breaking my arm, you're breaking my arm, you're breaking my arm." (Palmer Depo. 288-89; Warner Depo. 48) McKenzie, who was approximately 15 feet away on the porch outside, heard Palmer tell the officers they were breaking her arm. (McKenzie Depo. 115, 182-83) Officer Richardson continued applying force to Palmer's arm and she felt it "pop." (Palmer Depo. 163) Palmer testified that she got nauseous, threw up in her mouth, and swallowed it. (Palmer

4

Depo. 240) Officer Richardson also heard a "pop." (Richardson Depo. 77) He nonetheless completed handcuffing Palmer behind her back, but when they realized Palmer was injured, they moved the cuffs to her front. (Palmer Depo. 290; Richardson Depo. 77)

The officers then radioed for Sergeant Roy Sims to respond to the scene due to Palmer's statement that she was injured. (Sims Depo. 8) When Sims arrived, the officers explained what had happened. Sims observed that Palmer was handcuffed in front of her body, which was against department policy, but Sims okayed this procedure due to Palmer's injury. Sims then instructed the officers to get Palmer medical attention. (Sims Depo. 12) The officers then transported Palmer to St. Elizabeth North Hospital.

Palmer was later cited for resisting arrest and disorderly conduct and released. Palmer completed a diversion program pursuant to the dismissal of those charges.

It was later discovered that Palmer had been diagnosed in 2006 with osteoporosis and low bone density for her age. (Doc. #69, Exh. G) This diagnosis identified Palmer as a "high risk of fracture." (*Id.*) Palmer did not tell the police officers of this fact.

Palmer later underwent surgery to repair her broken arm. Dr. John Wyrick, the orthopaedic surgeon who performed the operation, has given an affidavit which states that he personally observed Palmer's broken bone; that it was not a diseased bone or

a bone with low density; that the humerus is a "substantial" bone in the body; and that in order for Palmer's humerus to have been fractured, it would have required force of a "substantial" nature. (Wyrick Aff., Exh. C to Plf. Memo. Opp., Doc. 73-4)

Palmer filed this lawsuit on October 9, 2007, against the City of Covington and Officers Richardson and Warner, in both their individual and official capacities. (Doc. #1) Palmer alleges excessive force and unlawful arrest pursuant to 42 U.S.C. § 1983, as well as state law claims against the officers for assault and battery and intentional infliction of emotional distress.

### *Analysis*

**A.   Officers Warner and Richardson (Individual Capacity Claims)**

Plaintiff has sued Officers Warner and Richardson in their individual capacities for claims under § 1983 alleging false arrest and excessive force. Both defendants have invoked the defense of qualified immunity.

An individual defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Morrison v. Bd. of Trustees of Green Township*, – F.3d –, No. 08-3051, 2009 WL 3211946, at *4 (6th Cir. Oct. 8, 2009) (citation

omitted). A right is "clearly established" if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citation and internal quotations omitted). "Thus, the relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (citation omitted).

### 1. **Excessive Force**

The Sixth Circuit applies the Fourth Amendment's unreasonable seizure jurisprudence when analyzing excessive force claims in the context of an arrest. *Morrison*, 2009 WL 3211946, at *4. Whether an officer has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard. *Id.*

This assessment entails a fact-specific inquiry based on the totality of the circumstances that considers (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* (citation omitted). This standard requires the court to view the conduct from the prospective of a reasonable officer on the scene. *Id.*

Applying these factors and viewing the evidence in plaintiff's favor, summary judgment is not appropriate on the

excessive force claim against the officers, and these individual defendants are not entitled to qualified immunity. There are numerous genuine disputes of material fact which, drawing all inferences in plaintiff's favor, could establish that she was subjected to excessive force in violation of the Fourth Amendment.

First, the crime for which plaintiff was charged – disorderly conduct – is not a particularly serious crime (a second degree misdemeanor) and did not involve violence. *See Harris v. City of Circleville*, – F.3d –, No. 08-3252, 2009 WL 3151148, at *8 (6th Cir. Oct. 2, 2009) (holding in analysis of excessive force claim that DUI, speeding, and failure to appear in court were not particularly serious crimes and did not involve violence).

Viewing the evidence in plaintiff's favor, the second and third factors cited above also weigh against the officers. Defendants testified, for example, that Palmer continued to yell and scream at them and McKenzie up until the time they placed her under arrest. (Richardson Depo. 67) Palmer and McKenzie testified, however, that Palmer was calm once she realized he was leaving without incident, and that Palmer at no time yelled or screamed at him once he went outside. (Palmer Depo. 211; McKenzie Depo. 186) Moreover, while Palmer told the officers to "get the hell out" of her house after she told asked them to

8

leave several times, McKenzie testified that Palmer was not "out of control" and was not a danger to herself or anyone else. (McKenzie Depo. 210-12)

Further, defendants testified that they believed Palmer might use the cell phone she was holding as a weapon and that she refused to put it down when they instructed her to do so. (Richardson Depo. 64-66, Warner Depo. 46) To the contrary, Palmer testified that she did not resist and immediately dropped her cell phone. (Palmer Depo. 212, 284)

Palmer also testified that she did not resist being arrested or handcuffed, while the officers testified that she resisted being handcuffed and tried to pull away. (Richardson Depo. at 77; Warner Depo. 42, 46)

In sum, accepting Palmer's testimony as true, she was standing in her pajamas in her own hallway, she had calmed down, McKenzie had agreed to leave and was outside so there was no longer a potential confrontation, and Palmer told the police she no longer needed their assistance and that they should leave her house. Nonetheless, the police officers began yelling at her with intimidating language, Officer Warner shoved her up against the foyer wall, and Officer Richardson twisted her right arm high up her back (even after her left arm was already handcuffed) and continued to apply force, even as she stated three times "You're breaking my arm," eventually breaking the large upper arm bone,

9

requiring surgery to repair it.  Under these circumstances, the officers' actions could have violated plaintiff's right under the Fourth Amendment to be free of excessive force during an arrest. *See Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 173 (6th Cir. 2004) (district court correctly denied qualified immunity to police officer who broke plaintiff's arm during arrest).

Moreover, while it was Officer Richardson who actually twisted plaintiff's right arm – the arm that broke – Officer Warner continued to restrain plaintiff while Richardson did so, even though she was yelling that they were breaking her arm.  A jury question thus exists as to whether Warner's use of force was excessive under the circumstances.

Accordingly, these facts taken in a light most favorable to Palmer are sufficient to establish a violation of her constitutional rights under the Fourth Amendment.  Further, because, interpreting the evidence most favorably to the plaintiff, it would have been clear to a reasonable officer that the amount of force used was excessive, defendants are not entitled to qualified immunity.  *See Solomon*, 389 F.3d at 174-75. *See also Shreve v. Jessamine County. Fiscal Court*, 453 F.3d 681, 686-88 (6th Cir. 2006) (reversing district court's grant of summary judgment to police officers on excessive force claim; even though officers' version of events seemed stronger and there were inconsistencies in plaintiff's testimony, facts construed in

her favor still created issue for jury).

### 2. False Arrest

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citation omitted), *cert. denied*, 129 S. Ct. 35 (2008). Accordingly, in order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. *Id.*

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Id.* (citation omitted). This inquiry depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Id.* Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law. *Id.* (citation omitted).

Here, Officers Warner and Richardson arrested plaintiff for disorderly conduct in the second degree, a Class B misdemeanor. Under Kentucky law, this offense encompasses certain behavior such as fighting, making unreasonable noise, creating a hazard, etc., "**when in a public place and with intent to cause public inconvenience, annoyance or alarm. . .**" KRS 525.060 (emphasis added). "Public place" means

11

> a place to which the public or a substantial group if persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds, and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. **An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place.**

KRS 525.010(3) (emphasis added).

Although it is undisputed that plaintiff was not in a "public place" at the time she was arrested – she was at all times inside her home -- it is disputed whether her alleged yelling was producing "offensive or proscribed" consequences outside the dwelling. Accordingly, there is at least a triable issue as to whether defendants could reasonably have believed they had probable cause to arrest plaintiff for this offense.[1]

---

[1] To the extent that defendants argue that plaintiff must be able to show that the criminal charges resulted in a "favorable termination," they are mistaken. Defendants rely on authority applicable to malicious prosecution claims, rather than false arrest claims such as that asserted by plaintiff. *See Butts v. City of Bowling Green*, 374 F. Supp.2d 532, 536 (W.D. Ky. 2005) (distinguishing these two types of claims). The complaint here contains no claim for malicious prosecution, only false arrest.
  Finally, the doctrines of both issue and claim preclusion require that the contested issue – here, whether there was probable cause for plaintiff's arrest – actually have been adjudicated on the merits. *See generally Stemler v. Florence*, 350 F.3d 578, 586-88 (6th Cir. 2003). Although defendants state in their briefs that plaintiff's criminal charges were "adjudicated" by virtue of the diversion program, in fact the question of probable cause has never been actually determined. *See, e.g., Knox v. City of Royal Oak*, No. 06-10428, 2006 WL 3825069, at *4 (E.D. Mich. Dec. 26, 2006) (holding that plaintiff's § 1983 claim for false arrest was not barred by collateral estoppel; issue of probable cause was never litigated because criminal charge was dropped in exchange for her plea to

### 3. State Law Claims

Defendants next assert that they are entitled to qualified immunity on plaintiff's state law claims for assault and battery and outrage.

"Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions and judgment) and are made in good faith and within the scope of their authority or employment." *Autry v. Western Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007). "However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith." *Id.*

For the reasons already discussed above, construing the record in plaintiff's favor, a reasonable jury could conclude that Officers Warner and Richardson violated plaintiff's constitutional rights and that they were not acting in good faith when they arrested her and used force which resulted in the breaking of her arm. Summary judgment on the state law claims

---

civil infraction). *Cf. Dier v. City of Prestonburg*, 480 F. Supp.2d 929, 936-37 (E.D. Ky. 2007) (plaintiff was collaterally estopped from asserting false arrest claim because he pled guilty and was convicted of underlying charge). The question of whether there was probable cause for plaintiff's arrest has never been determined, and the principles of estoppel thus do not apply.

against the individual defendants is thus also inappropriate.

    **B.**    **The City of Covington**[2]

A city of municipality may be liable under § 1983 only where the city itself causes the constitutional violation at issue, as a city may not be liable under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a plaintiff seeking to subject a city to liability under § 1983 for the actions of its officers must show that the alleged federal right violation occurred because of a municipal policy or custom.

The City of Covington is entitled to summary judgment on the claim against it because plaintiff has raised no triable issue from which one could reasonably infer that any violation of her constitutional rights by Officers Warner and Richardson occurred as a result of an official policy or custom. Plaintiff has identified no policy or custom of the City of Covington that she alleges led to the alleged excessive force used against her during her arrest.

Instead, it is undisputed that both Officers Warner and Richardson were qualified for their positions as police officers and both met the state requirements for continuing training on all relevant laws and procedures. There are no facts alleged

---

[2]This analysis also applies to the "official capacity" claims against Officers Warner and Richardson.

from which a jury could reasonably infer that the City was negligent, much less deliberately indifferent, in hiring, training, or supervising these officers, or that the City's policies regarding the use of force were inadequate or related in any way to the alleged violation of plaintiff's rights.

Therefore, having heard the parties, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) The motion for summary judgment by defendants Richardson and Warner (Doc. #69) be, and is hereby, **DENIED**;

(2) The motion for summary judgment by the City of Covington (Doc. #67) be, and is hereby, **GRANTED**;

(3) This matter is set for a **jury trial on Monday, March 22, 2010 at 10:00 a.m.**; and

(4) A final pretrial conference is set for **Friday, March 5, 2010 at 1:30 p.m.**  The parties are directed to comply with this court's standard final pretrial order entered concurrently herewith.  The parties are admonished that no oversized demonstrative exhibits shall be permitted at trial.

This 5th day of November, 2009.



Signed By:
William O. Bertelsman  WOB
United States District Judge

TIC: 45 min.

15